**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **VALERIE SUPINSKI** | : | |
| **Plaintiff** | : | |
| | : | |
| **VS.** | : | **3:CV-02-0271** |
| | : | **(CHIEF JUDGE VANASKIE)** |
| **SUPER MARKET SERVICE CORP.,** | : | |
| **THE GREAT ATLANTIC AND PACIFIC** | : | |
| **TEA, CO., INC.** | : | |
| **Defendants** | : | |

**MEMORANDUM**

This is an employment discrimination action against Defendants Super Market Service

Corporation ("SMS") and the Great Atlantic and Pacific Tea Company ("A & P") under the

Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101-12213.  Plaintiff

Valerie Supinski, who has sustained permanent nerve damage to her left forearm, essentially

asserts two discrete claims: (1) Defendants failed to accommodate her disability by denying her

request to transfer into a less demanding position than the warehouse "floater" job she had

filled; and (2) Defendants retaliated against her after she requested the accommodation by

failing to reinstate her to the floater position after a three-day absence from work.

Defendants have moved for summary judgment.  Because the reassignment requested

by Supinski would have violated the seniority provisions of a collective bargaining agreement,

Defendants are entitled to judgment in their favor on her first theory of relief.  Because Plaintiff

has adduced sufficient evidence to support an inference that the failure to allow her to resume

work as a "floater" was motivated by a retaliatory animus, Defendants are not entitled to summary judgment on the second theory of recovery.  Therefore, Defendants' motion for summary judgment will be granted in part and denied in part.

## I.  BACKGROUND

SMS operates a warehouse and distribution center for supermarket products in Dunmore, Pennsylvania.  (Defs.' Statement of Material Facts ("S.M.F."), Dkt. Entry 39 ¶ 1.)[1]  In 1994, Supinski began working for SMS inside the warehouse  (Id. ¶ 2.)  All employees in the warehouse are represented by Teamsters Local 229.  (Id. ¶ 3.)  Employment conditions are governed by a collective bargaining agreement between the Teamsters and SMS.  (Id. ¶ 4.)

In May of 1996, Supinski became a full-time "floater" with union benefits.  (Id. ¶ 6.)  Typically, a floater's role is to cover the shift of an absent employee.  (See App. to Defs.' Mot. Summ. J., Dkt. Entry 40, Tab I, Barone Dep., Vol. II, at 54.)  This requires floaters to work a wide variety of jobs based on daily staffing needs in the warehouse.  (Defs.' S.M.F., Dkt. Entry 39 ¶ 6.)  According to Defendants, these jobs include acting as a hand jacker, selector, puller, sorter, or stocker.[2]  (Id. ¶ 7.)

---

[1] Citation to a paragraph in Defendants' Statement of Material Facts, submitted in accordance with Local Rule of Court 56.1, signifies that Plaintiff has admitted the factual assertion.

[2] A "hand jacker" (or "box selector") prices and stacks an order onto an electric hand jack and transports the order to a staging area.  A "puller" operates an electric pallet jack and transports loaded pallets from the dock to the storage area.  A "selector" separates items from a flow rack and places them in a tote.  A "sorter" oversees totes traveling on a conveyor and

On July 18, 1998, Supinski was shot in the left arm while visiting Lehigh Gorge State Park.  (Id. ¶ 8; App. to Defs.' Mot. Summ. J., Dkt. Entry 40, Tab B at 74.)  The gunshot wound caused permanent radial nerve damage to her left arm.  (Defs.' S.M.F., Dkt. Entry 39 ¶ 8.)  As a result, Supinski claims that use of her left arm and hand is severely limited.  (Ex. 28 to Supinski Dep., Vol. II, App. to Defs.' Mot. Summ. J., Dkt. Entry 40, Tab C.)  She has difficulty performing any activity that requires the use of her left hand, including: personal care (bathing, dressing, any washing or grooming not reachable by her right hand such as caring for her right arm); cooking (handling pots and pans, opening containers, cutting); household activities (washing and drying dishes, vacuuming, cleaning clothes, shoveling snow); motherhood (freely exercising with or caring for her young son); and physical exercise (riding a bicycle, gripping a ball, swimming, weight lifting).  (App. to Defs.' Mot. Summ. J., Dkt. Entry 40, Tab C, Supinski Dep., Vol. II, at 180-94.)

Plaintiff was unable to return to work for more than five (5) months following her injury. In December of 1998, Supinski requested her physician to allow her to return to work.  (Ex. 16 to Pl.'s App., Dec. 11, 1998 Office Note of Dr. Schneider, Dkt. Entry 49.)  In his record of a December 11, 1998 office visit, Dr. Schneider indicated that he gave Plaintiff a note to the effect that she should not work overtime.  Although observing that she "did not want any work

---

separates heavier totes which need to be specially packed.  A "stocker" maintains even distribution of items in the storage area.  (See App. to Defs.' Mot. Summ. J., Dkt. Entry 40, Tab E.)  The physical demands of each job differ.  For example, the hand jacker and sorter jobs require lifting and carrying more than 50 pounds; the selector job does not.  (Id.)

restrictions," Dr. Schneider was skeptical that Supinski would be able to perform all aspects of her job.  (Id.)

In January 1999, Supinski returned to SMS as a floater.  (Defs.' S.M.F., Dkt. Entry 39 ¶ 9.)  The parties do not address her work performance upon her return to work, or whether she was limited in the types of jobs she could perform.  Nor do they discuss whether she worked overtime, i.e., beyond eight hours.  Plaintiff has presented a report of Dr. Schneider dated August 27, 1999, in which he notes that Plaintiff complained of considerable pain after using a hand jack.  (Ex. 16 to Pl.'s App., Dkt Entry 49.)  Dr. Schneider's report included a handwritten note stating that Supinski was not to lift over 50 pounds, use a hand jack or work overtime.  The note also indicated that the restrictions were permanent.

On September 14, 1999, Supinski was successful on a temporary job bid as a "Selector" on the housewares line.  (Defs.' S.M.F., Dkt. Entry 39 ¶ 11.)  As a selector on the housewares line, Supinski would select individual items from a flow rack, place a label on the item, and place the item in a tote.  After the tote was full, she would place the tote on a conveyor line. (Id.)  The work did not require use of a hand jack or lifting and carrying more than 50 pounds, and was thus consistent with Dr. Schneider's limitations.  The parties do not address her performance during this period or whether she worked overtime.

In the Spring of 2000, Supinski contracted bronchitis that necessitated hospitalization. She missed work from April 9, 2000 to June 26, 2000.  (Id. ¶ 12; App. to Defs.' Mot. Summ. J., Dkt. Entry 40, Tab C, Supinski Dep., Vol. II, at 33.)  In accordance with the collective bargaining

4

agreement, Supinski lost her selector position while she was out on medical leave.  (Defs.'

S.M.F., Dkt. Entry 39, ¶ 15.)

In anticipation of her return to work, Supinski obtained a note from Doctor Alocci

reiterating the restrictions that she not work more than eight hours per day, lift more than 50

pounds, or use a hand jack.  SMS received this note on June 22, 2000, and Plaintiff returned to

work as a floater on June 26, 2000.  (Id. ¶ 17.)

While at work on June 26, 2000, Supinski attended a meeting at which employees were

informed of the implementation of a third shift commencing July 17, 2000.  (Id. ¶ 18.)   This new

shift called for four consecutive ten-hour nights.  The collective bargaining agreement between

SMS and the Teamsters that went into effect in March of 2000 gave SMS the authority to

create such shifts.  (Id. ¶ 19.)

Supinski was told on June 26, 2000, that she would be assigned to this new, ten-hour

shift as a floater due to her relatively low seniority.  (Id. ¶ 22.)  Supinski objected to the

assignment, referring to her physician's instructions restricting her from working more than eight

hours a day, operating a hand jack, or lifting more than fifty pounds due to the nerve damage to

her left arm.  (Id. ¶ 25.)

It appears that on this date Supinski was given a notice pertaining to mandatory

overtime.  This notice suggested that qualified persons with a disability could be excused from

mandatory overtime provided appropriate documentation were submitted.  (App. to Defs.' Mot.

Summ. J., Dkt. Entry 40, Tab C, Supinski Dep., Vol. II, Ex. 8.)  Dr. Alocci made a handwritten

notation on this notice, inquiring as to whether there were any specific forms to confirm Supinski's inability to work mandatory overtime.  (Ex. 10 to Pl.'s App., Dkt. Entry 48.)  His note is dated June 27, 2000.

Also on June 27, 2000, while working as a floater, Supinski claimed that she sustained a work-related injury.  (Defs.' S.M.F. ¶ 33.)  She was sent to SMS's worker compensation doctor. (Id. ¶ 34.)  Under SMS's workers compensation program, Supinski was assigned to temporary alternate work from June 27 through June 30, 2000.  (Id. ¶ 35.)  On June 30, 2000, the company doctor determined that Supinski's injury was not work-related and released her from SMS's Return to Work Center.  (Id. ¶ 36.)

SMS contends that Plaintiff was told on June 30th that her physician would have to clear her for return to work.  (App. to Defs.' Mot. Summ. J., Dkt. Entry 40, Tab C, Supinski Dep., Vol. II, Ex. 12.)  Supinski submitted a handwritten note dated June 30, 2000 from Dr. Alocci, stating that she could return to work, but for no more than 8 hours per day and with no lifting over 50 pounds or using a hand jack.  (Ex. 11 to Pl.'s App., Dkt. Entry 49.)  These were the same conditions imposed by Dr. Alocci when Plaintiff was allowed to return to work on June 26, 2000. Nonetheless, SMS refused to allow Plaintiff to return to her floater position during the few weeks before the ten-hour shift commenced.

On July 1, 2000, Supinski informed SMS in writing that Attorney Paul Jennings had been retained as her "Representative."  (App. to Defs.' Mot. Summ. J., Dkt. Entry 40, Tab C, Supinski Dep., Vol. II, Ex. 13.)   Attorney Jennings wrote to SMS on July 3, 2000, advising SMS that he

was to be involved "throughout all 'inter-active' steps and discussions toward formulation of appropriate Reasonable Accommodations." (Id., Ex. 14.)  Reiterating that Supinski could not work more than 8-hour shifts, lift more than 50 pounds, and work as a "handjacker," Attorney Jennings requested as a "reasonable accommodation" that she be assigned work in the "picking" department.[3] (Id.)

By letter dated July 13, 2003, SMS responded to Mr. Jennings' letter.  (Id., Ex. 15.)  In this reply, SMS stated that it was awaiting receipt of medical documentation indicating that Supinski was able to return to work in the floater position.  SMS also stated that if Supinski's doctor required "information about her job responsibilities, she may authorize him or her to contact" SMS.  (Id.)  Plaintiff's counsel then supplied another note from her physician restricting Plaintiff's work hours, lifting and use of a hand jack, along with other medical documentation.  By letter dated August 24, 2000, an attorney for SMS set forth the following reasons for refusing Plaintiff's request to be given a position as a selector working no more than 8-hour shifts:

> (1)  Plaintiff had not shown that she was disabled so as to be entitled to consideration for a reasonable accommodation;
>
> (2) working in excess of 8 hours a day was an essential function of all warehouse positions; and

---

[3] This was an apparent reference to her work as a selector.  As noted above, the job description for this position did not require lifting of more than 50 pounds.

7

(3) placement of Plaintiff in the selector position on an 8-hour shift

would violate seniority provisions of the applicable collective

bargaining agreement.

(Id., Ex. 16.)

In moving for summary judgment, SMS essentially reiterates the position advanced at

the time it refused the request for a reasonable accommodation.  In particular, it argues that the

collective bargaining agreement's seniority provisions precluded placement of Plaintiff in a

position other than third shift floater.  SMS further asserts that Plaintiff could not fill the floater

job due to restrictions on work hours and exertional effort.

## II.  DISCUSSION

### A.      Standard of Review

Summary judgment should be granted when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  FED. R. CIV. P. 56(c).  A fact is "material" if proof of its existence or

nonexistence might affect the outcome of the suit under the applicable law.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  Id.

All doubts as to the existence of a genuine issue of material fact must be resolved

against the moving party, and the entire record must be examined in the light most favorable to

nonmoving party.  Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982).  The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor.  Anderson, 477 U.S. at 256-57.  Merely conclusory allegations taken from the pleadings are insufficient to withstand a motion for summary judgment.  Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  Summary judgment is to be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## B.    ADA

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A "qualified individual with a disability" is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  A disability is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).

9

The plaintiff asserting an ADA claim bears the initial burden of establishing a prima facie case of unlawful discrimination by demonstrating that: (1) she is a member of the protected class in that she has a "disability"; (2) she is qualified for the position in that she can perform the work with reasonable accommodations; and (3) she has suffered an adverse employment decision as a result of discrimination. Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999).  Once the plaintiff demonstrates a prima facie case of discrimination, the burden shifts to the employer to show some legitimate, non-discriminatory reason for the employment decision.  If the employer can make this showing, the burden shifts back to the plaintiff to demonstrate that the asserted reason for the decision was a pretext for discrimination.  Olson v. Gen'l Elec. Astrospace, 101 F.3d 947, 951-52 (3d Cir. 1996).

Defendants argue that Supinski has failed to present evidence that she suffered a "disability" under the ADA or that she is a "qualified individual with a disability."  They further contend that the requested accommodation of assigning her the selector job was not reasonable because it ran afoul of the seniority system established in the collective bargaining agreement.

**1.    Whether Supinski has a "Disability" Under the ADA**

Defendants do not deny that Supinski is physically impaired as a result of the nerve damage in her left arm.  Merely having an impairment, however, does not make one disabled for the purposes of the ADA.  See Toyota Motor Mfg. v. Williams, 534 U.S. 184, 195 (2002).  Supinski must also "demonstrate that the impairment limits a major life activity."  Id.  Major life

10

activities are "those activities that are of central importance to daily life." Id. at 197.  The EEOC

regulations, which were promulgated to implement the ADA, include as major life activities:

"caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing,

learning, and working."  29 C.F.R. § 1630.2(i).

In addition, a plaintiff must demonstrate that her impairment "substantially limits" a major

life activity.  42 U.S.C. § 12102(2)(A); see also Toyota, 534 U.S. at 195.  The EEOC regulations

clarify that "substantially limits" means the plaintiff is "[u]nable to perform a major life activity

that the average person in the general population can perform" or is "significantly restricted as

to the condition, manner or duration under which [she] can perform a particular major life

activity as compared to the condition, manner or duration under which the average person in

the general population can perform the same major life activity."  See id. at 195-96 (quoting 29

C.F.R. § 1630.2(j)).  Consistent with congressional intent, courts must strictly interpret the

terms "major life activities" and "substantially limits" to "create a demanding standard for

qualifying as disabled."  Id. at 197.  The Supreme Court has explained that "an individual must

have an impairment that prevents or severely restricts the individual from doing activities that

are of central importance to most people's daily lives. The impairment's impact must also be

permanent or long term."  Id. at 198 (citing 29 C.F.R. § 1630.2(j)(2)(ii)-(iii)).  Finally, the

Supreme Court has emphasized that courts must determine the existence of a disability on a

case-by-case basis.  See id. at 198.

Supinski claims that her left arm is essentially useless.  This, she contends, limits her

from performing the major life activities of caring for herself and performing manual tasks.  (Pl.'s

Br. in Opp. of Mot. Summ. J., Dkt. Entry 48, at 12.)  Supinski supports her argument with

evidence that she has difficulty preparing food and maintaining a clean living environment.

Defendants quote Marinelli v.  City of Erie, 216 F.3d 354, 362 (3d Cir.  2000), for the

proposition that "'cleaning,' or, more generally, 'doing housework,' does not qualify as a major

life activity."  However, the court clarified that "cleaning" may be a major life activity "to the

extent that such an activity is necessary for one to live in a healthy and sanitary environment."

Id.  at 362-63; see also Toyota, 534 U.S. at 202 (noting household chores and personal

hygiene "are among the types of manual tasks of central importance to people's daily lives");

Dutcher v.  Ingalls, 53 F.3d 723, 726 (5th Cir. 1995)(indicating that basic activities such as

feeding oneself, driving a car, attending to personal grooming, washing dishes, vacuuming, and

picking up trash fall into the category of caring for oneself).  Accordingly, Supinski has properly

identified caring for herself as a major life activity.

Defendants contend that Supinski is not "substantially limited" from caring for herself.

Defendants note that she is right-handed, and the injury to her left arm causes only minor

difficulties.  She can still physically perform most tasks necessary for caring for herself.  For

instance, she can shower, drive a car, dress herself, run a carpet sweeper and wash clothes.

Supinski counters that she can only perform these tasks with difficulty.  Relying on the EEOC

regulations, Supinski argues that she is "substantially limited" from caring for herself because

she is significantly restricted in the condition, manner, and duration in which she can care for

herself compared to the average person in the general population.  See 29 C.F.R. §

1630.2(j)(1)(ii).

Supinski supports her position with evidence that she has greater difficulty than the

average person in meal preparation, personal hygiene, and household chores.[4]  Certainly, a

reasonable jury could deny that Supinski is disabled under these facts.  Yet Supinski has

presented adequate evidence from which a jury might return a verdict in her favor.  See Fenney

v.  Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 716 (8th Cir.  2003)(finding a plaintiff with limited

use of his right hand was disabled under the ADA for summary judgment purposes because "it

takes him twice as long as an average person to perform his 'taking care of himself' tasks –

bathing, shaving, preparing a meal, dressing, and going to the restroom.").  Therefore,

Defendants have failed to establish that they are entitled to summary judgment on this issue.[5]

### 2.      "Qualified Individual With a Disability"

Defendants also argue that Supinski is not a "qualified" individual because she could not

perform the physical duties nor work the hours essential to the assigned third shift floater

---

[4] In terms of preparing food, Supinski testified that she has difficulty handling pots and pans, cutting foods, and opening containers.  Her personal care is limited because she cannot wash, shave, or apply moisturizer to any part of her body not reachable by her right hand.  She also has difficulty dressing, particularly using clasps and buttons that require two hands.  Finally, she testified that she is limited in washing and cleaning dishes, vacuuming, doing laundry, and shoveling snow.

[5] Since Supinski has presented sufficient evidence from which a jury could determine she is disabled under the ADA, a discussion of the alternative means for establishing a disability under the ADA is unnecessary.  See 42 U.S.C. § 12102(2).

position.  Supinski admits that as a floater she could be assigned to a wide variety of tasks depending on daily staffing needs.  It is uncontested that Supinski could not perform at least some of these tasks because her physical limitations prevented her from operating a hand jack, palletizing, or lifting more than fifty pounds.  Nor could she work the mandatory ten hours required of those working the new third shift.

The issue, though, is not whether she could perform all the requirements of the floater position, but whether she could do the "essential functions" of the job.  The EEOC regulations provide some assistance in determining whether a job function is essential or marginal: "(1) whether the performance of the function is 'the reason the position exists;' (2) whether there are a 'limited number of employees available among whom the performance of that job function can be distributed;' and (3) whether the function is 'highly specialized so that the incumbent in the position is hired for his or her expertise.'"  Skerski v. Time Warner Cable Co., 257 F.3d 273, 279 (3d Cir. 2001)(citing 29 C.F.R. § 1630.2(n)(2)).

SMS utilized floaters to cover a wide variety of staffing needs.  This indicates that the ability to perform multiple jobs was an essential function of the floater position.  See Miller v. Illinois Dept. of Corrections, 107 F.3d 483, 485 (7th Cir. 1997)("If it is reasonable for a farmer to require each of his farmhands to be able to drive a tractor, clean out the stables, bale the hay, and watch the sheep, a farmhand incapable of performing any of these tasks except the lightest one (watching the sheep) is not able to perform the essential duties of his position.").  Yet it is unclear that the ability to perform all the floater duties – rather than most of the floater duties –

14

was an essential function of the job.  See Skerski, 257 F.3d at 281-83 (finding that climbing is

not an essential function of cable installer position when plaintiff could perform most other cable

installer duties).

After returning to work following her gunshot injury, Supinski worked as a floater for nine

months.  The evidence supports a reasonable inference that during this nine month period she

was confronted with the same exertional limitations present in the Summer of 2000.  No

evidence has been offered to suggest that these limitations disqualified her from working as a

floater.  See 29 C.F.R. § 1630.2(n)(3)(iv).  Nor is there any evidence that SMS had a "limited

number of employees available among whom the performance" of hand jacking, palletizing, or

lifting more than fifty pounds could be distributed.  29 C.F.R. § 1630.2(n)(2)(ii).  Perhaps other

floaters could perform the few jobs that Supinski could not perform without any adverse impact

on SMS.  A reasonable jury could find that SMS did not need floaters to be capable of

performing all the jobs.  Indeed, the evidence does not indicate that all floaters were capable of

performing all the jobs.[6]  Significantly, Supinski was allowed to resume the position of floater on

June 26, 2000 even though Dr. Alocci imposed restrictions that SMS claims disqualified her

from the job.  At a minimum, a question of material fact remains whether the ability to work all

---

[6] SMS's Human Resources Manager testified that floaters could only select jobs from
the "float list" that they were qualified to perform.  (App. to Defs.' Mot. Summ. J., Dkt. Entry 40,
Tab I, Barone Dep., Vol. II, at 55)  This implies that floaters were not always qualified to
perform a job.  This is not surprising, since some of the jobs that floaters performed required
special skills like operating a forklift or mechanical ability.  (App. to Defs.' Mot. Summ. J., Dkt.
Entry 40, Tab E.)

the warehouse jobs was an essential function of the floater position.

Nonetheless, the evidence clearly shows that working ten hours a day was an essential function of the third shift floater position.  First, SMS required all employees on the third shift to work ten hours and all warehouse employees to work overtime.  See Tate v. Farmland Indus., Inc., 268 F.3d 989, 993 (10th Cir. 2001)("The question of whether a job requirement is a necessary requisite to employment initially focuses on whether an employer actually requires all employees in the particular position to satisfy the alleged job-related requirement.").  Second, SMS created the third shift floater position to facilitate the moving and separation of freight during the nights.  See 29 C.F.R. § 1630.2(n)(2)(i).  To perform this task, third shift floaters had to be present at the warehouse during the shift.  This supports the conclusion that working ten-hours was an essential function of the job.  Finally, SMS would suffer adverse consequences if Supinski did not work the full ten-hour shift.  See 29 C.F.R. § 1630.2(n)(3).  If Supinski worked only eight hours of the ten-hour shift, SMS would either lose two hours of productivity or need to hire another employee to cover for the missed time.  Consequently, Defendants have established as a matter of law that working ten hours was an essential function of the third shift floater position.  Thus, unless SMS was required to accommodate the restriction on her work hours, SMS would not violate the ADA by determining that Supinski was unable to work the third shift floater position.[7]

_____

[7] This determination does not foreclose Plaintiff's retaliation claim, which concerns the refusal to place her in the floater position on the eight-hour shift she was working when she

**3.     Reasonable Accommodation**

An employee who normally cannot perform the essential functions of a job may still be covered by the ADA if she can perform the essential functions with "reasonable accommodation" by her employer.  42 U.S.C. § 12112(a)-(b).  Plaintiff requested SMS to accommodate her disability by allowing her to work only eight hours a day as a selector.

Courts have held that an employer may be required to reassign a qualified employee with a disability to a "position wholly distinct and different from the one the disabled employee previously held."  Gile v. United Airlines, 95 F.3d 492, 497-98 (7th Cir. 1996).  However, such reassignment is not reasonable in "the run of cases," when it conflicts with the seniority provisions of a collective bargaining agreement.  U.S. Airways v. Barnett, 535 U.S. 391, 403 (2002); see also Kralik v. Durbin, 130 F.3d 76, 83 (3d Cir. 1997).  Supinski stated she could not work the ten hours required by the third shift.  Relying on Barnett, SMS argues that transferring Supinski from the third shift was not a reasonable accommodation because it would violate the seniority provisions of its collective bargaining agreement with the Teamsters.

The Supreme Court in Barnett, however, stated that a plaintiff may show "special circumstances" why violation of a seniority system is reasonable in a particular case.  535 U.S. at 405.  For example, a plaintiff could show:

> that the employer, having retained the right to change the seniority
> system unilaterally, exercises that right fairly frequently, reducing

_____

returned to work in June of 2000.

> employee expectations that the system will be followed – to the
> point where one more departure, needed to accommodate an
> individual with a disability, will not likely make a difference. The
> plaintiff might show that the system already contains exceptions
> such that, in the circumstances, one further exception is unlikely to
> matter.

Id. at 405-06.  The plaintiff bears the burden of showing such special circumstances.  Id. at 406.

Supinski presents three arguments for why special circumstances exist in this case for breaching the collective bargaining agreement.  First, the third shift was only one of many experiments by SMS to increase productivity in the warehouse at the time.  SMS frequently tried many other experiments, such as layoffs, adding shifts, and asking employees to do different job functions.  According to Plaintiff, this indicates that SMS could have released her from working the third shift without an adverse effect during this irregular period.  Second, Defendants offered to contact the Teamsters on behalf of Supinski to see if any of her co-workers would be willing to trade shifts and/or job assignments with Plaintiff.  This, she contends, shows that SMS could exempt her from the third shift.  Third, Plaintiff notes that many exceptions existed in the collective bargaining agreement from working the ten-hour shift, such as participating as a member of a wedding party, funeral leave, vacation leave, and a doctor's certificate of illness.  Plaintiff asserts that considering this evidence as a whole, SMS provided many exceptions to the ten-hour shift and mandatory overtime, and one more departure for her disability would not likely make a difference.

Plaintiff's argument is flawed.  In Barnett, the Supreme Court's opinion was based on

18

the policy of preserving seniority systems that promote "consistent, uniform treatment" of employees. Id. at 404. An employer who makes frequent exceptions to the seniority system betrays this policy. Id. at 405. It is only when an employee can show that a defendant does not treat employees uniformly because of frequent individual exceptions may a further exception be reasonable. See id. at 405-06. Plaintiff's evidence shows that SMS applied its seniority system uniformly to all employees. First, though SMS did experiment with many ways to increase productivity, SMS always required that more senior employees receive preferential treatment to junior employees. Likewise, the fact that Defendants suggested seeking volunteers actually shows that SMS did not make unilateral individual exceptions to the seniority system. See id. at 405. Finally, the exceptions to mandatory overtime in the collective bargaining agreement are underline exceptions. All employees, for instance, can expect to be released from mandatory overtime to attend the funeral of an immediate family member. This does not frustrate "employee expectations of fair, uniform treatment." Id. at 404. On the contrary, these are the type of uniform employment policies that the Supreme Court sought to reinforce in Barnett. The Barnett Court decided that preserving a uniform seniority system was more important than accommodating a disabled employee through violation of the seniority system. Accordingly, this Court finds that SMS could not reasonably accommodate Plaintiff by reassigning her in violation of its seniority system.

Supinski's final argument is that SMS failed to engage in a good faith "interactive

process" with her to discuss reasonable accommodations for her disability.  29 C.F.R. §

1630.2(o)(3).  The evidence, however, does suggest that SMS engaged in good faith in an

interactive process with Plaintiff:  Defendants explained the collective bargaining agreement to

Plaintiff; suggested seeking volunteers to switch positions with her; and responded to

correspondence from Plaintiff's lawyer.

Regardless, Plaintiff's argument fails because she has not established the existence of a

position into which she could have been transferred.  In a failure-to-transfer case, the plaintiff

must demonstrate (1) a vacant, funded position existed; (2) the position was not above the

plaintiff's former position; and (3) the plaintiff could perform the essential functions of the

position with reasonable accommodation.  Shapiro v. Township of Lakewood, 292 F.3d 356,

360 (3d Cir. 2002)(citing Donahue v. Consol. Rail Corp., 224 F.3d 226, 230 (3d Cir. 2000)).

Furthermore:

> if, after a full opportunity for discovery, the summary judgment
> record is insufficient to establish the existence of an appropriate
> position into which the plaintiff could have been transferred,
> summary judgment must be granted in favor of the defendant –
> even if it also appears that the defendant failed to engage in good
> faith in the interactive process.

Id.  Supinski has not demonstrated a position into which she could have been transferred.  As

stated above, the collective bargaining agreement barred SMS from transferring Supinski from

the third shift floater job.  Therefore, Supinski does not have a legal remedy for her claim that

SMS failed to engage in the "interactive process" with respect to the third shift floater position.

The third shift, however, was short-lived.  SMS abandoned it after about two months.
Plaintiff was barred from working as a floater both before the shift was implemented and after it
was terminated.  As noted above, there is a genuine dispute of fact as to whether the ability to
perform all warehouse jobs was an essential requirement of the floater position, and this
dispute is sufficient to call into doubt Defendants' assertion that Plaintiff was not returned to the
original floater post because she was unable to perform the essential functions of that job.
Thus, the fact that Defendants are entitled to summary judgment for the period of time during
which the third shift existed does not foreclose Plaintiff's retaliation claim, encompassing the
periods before and after the third shift's brief duration.

### C.    Retaliation Claim

Supinski claims that SMS violated the ADA by barring her from working as a regular shift
floater – both before and after SMS experimented with the third shift floater position – in
retaliation for her requesting an accommodation under the ADA.  It is unlawful under the ADA
for an employer to "discriminate against any individual because such individual has opposed
any act or practice made unlawful by [the ADA] or because such individual made a charge . . .
under [the ADA.]"  42 U.S.C. § 12203(a).  Because the ADA retaliation provision mirrors the
Title VII retaliation provision, courts analyze ADA retaliation claims under the same framework
developed for Title VII claims.  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).
A retaliation suit can proceed under either a "pretext" theory or a "mixed motives" theory.

Watson v. Southeastern Pa. Transp. Auth., 207 F.3d 207, 214 (3d Cir. 2000); Krouse, 126 F.3d at 500.  The evidentiary framework varies depending on which theory the suit proceeds under.

A "pretext" claim of retaliation follows the burden shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  In order for Supinski to establish a prima facie case of retaliation under this theory, she must show: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."  Krouse, 126 F.3d at 500.   If a plaintiff establishes the elements of a prima facie case of retaliation, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action."  Id.  If the Defendant meets this burden, the plaintiff must then prove that "retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." Id. at 501.  One way in which a Plaintiff may satisfy the burden is to show that the advanced reason was a pretext for retaliation.

Supinski presented enough evidence to establish a prima facie case of retaliation under the ADA.  She did engage in protected employee activity when she asked SMS to accommodate her physical restrictions by placing her in the selector position.  See 42 U.S.C. § 12112(b)(5)(A).  Soon afterwards, SMS barred her from returning to work as a floater.[8]  This

---

[8] Supinski's retaliation claim is that SMS did not allow her to continue to work as a regular shift floater either before or after the third shift experiment.  SMS's third shift experiment

proximity in time supports an inference of a causal connection between Supinski's request to SMS's human resources department for a reasonable accommodation and the department's refusal to allow her to return to work.  See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000); Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997).  SMS counters that it had a non-retaliatory reason for not allowing Supinski to return to work. Specifically, SMS claims it did not receive medical clearance from a doctor that Supinski could work as a floater.

Plaintiff presents enough evidence that a reasonable jury could find that the reason advanced by SMS is a pretext and that a retaliatory animus played a role in SMS's decisionmaking process.  First, SMS allowed Supinski to work as a floater for about nine-months after she returned to work from the gunshot injury.  SMS has not presented evidence that Supinski could not perform the duties of a floater during this time period.  It is reasonable to infer that she had the same physical restrictions during this period as she did on June 30, 2000, when SMS decided she could not work as a floater.[9]  Furthermore, after Supinski informed

_____

lasted from July 17, 2000 until mid-September, 2000.  SMS did not allow Plaintiff to work as a regular shift floater beginning on June 30, 2000.

[9] In Plaintiff's complaint, she states in January 1999 that she provided SMS with documented medical restrictions against working more than eight hours per day and lifting more than fifty pounds.  (Pl.'s Compl., Dkt. Entry 1 ¶ 20.)  It is unclear, however, whether Plaintiff supported this assertion with evidence following discovery.  She has presented evidence indicating that her doctor imposed such restrictions in August of 1999 and again when she returned to work in June of 2000.  It would thus appear that Plaintiff had the same restrictions in January 1999 as June 2000.

SMS of her medical restrictions on June 26, 2000, SMS still assigned her to the floater position. Only after she injured herself on June 27, 2000 and requested placement in a different position did SMS no longer allow Supinski to work as a floater.  Based on this evidence, a reasonable jury could conclude that the assertion that Supinski could not perform the essential functions of a floater was a pretext for an intent to retaliate against her for seeking an accommodation to avoid the third shift floater position.[10]

## III.  CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (Dkt. Entry 37) will be granted in part and denied in part.  An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie, Chief Judge
Middle District of Pennsylvania

---

[10]  An analysis under the"mixed motive" theory of retaliation is unnecessary because Plaintiff has presented enough evidence to survive Defendants' motion for summary judgment under a "pretext" theory of retaliation.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

VALERIE SUPINSKI                          :
            **Plaintiff**             :
                              :
**VS.**                                        :        3:CV-02-0271
                              :        **(CHIEF JUDGE VANASKIE)**
**SUPER MARKET SERVICE CORP.,**                :
**THE GREAT ATLANTIC AND PACIFIC**             :
**TEA, CO., INC.**                             :
            **Defendants**            :

## ORDER

    **NOW, THIS 20th DAY OF DECEMBER, 2005,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

    1.  Defendants' Motion for Summary Judgment (Dkt. Entry 37) is **GRANTED IN PART** and **DENIED IN PART**:

        (a) The motion is **GRANTED** regarding Supinski's employment discrimination claim under the ADA that Defendants failed to reasonably accommodate her disability by assigning her a job as a selector.

        (b) In all other respects, the motion is **DENIED.**

    2.  A telephonic status conference will be held on January 20, 2005 at 8:30 a.m. Counsel for Plaintiff is responsible for placing the call to (570) 207-5720 and all parties

should be ready to proceed before the undersigned is contacted.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie, Chief Judge
Middle District of Pennsylvania